## CITY OF PEORIA
## v.
## THOMAS J. WALKER.

*Municipal Corporations—Negligence—Personal Injuries—Excavation in Highway—Comparative Negligence.*

1. A municipal corporation has the right to have gas and water pipes sunk in its streets, and to give permission for the sinking thereof, and in such case the city is only required to use ordinary care in notify-

ing the public traveling on such streets of the true condition thereof, and if the public knows of such condition, or by the exercise of ordinary care could have known of it, the city is excusable for failure to give notice.

2. A person is negligent in placing himself in a position where by the frightening of his horses he will be in peril, particularly where there is a safer way open.

3. If ordinary prudence requires it, a municipality must construct barriers against teams and wagons falling into ditches being excavated in its streets, and it is a matter of fact for the jury in a given case to determine whether ordinary care required the city to guard against such accident as happened in such case.

4. When in a given case a jury has found facts upon which their verdict must necessarily be based, on insufficient evidence, and contrary to common reason and justice, it is the duty of this court upon appeal to set aside such verdict.

5. In an action brought to recover from a municipality for a personal injury alleged to have been occasioned through its negligence in connection with an excavation in one of its streets, this court holds that the plaintiff was negligent in driving upon that portion of the street in question, where he received his injury, and that the judgment in his favor can not stand.

6. There can be no recovery in such case where the plaintiff when injured was not exercising ordinary care.

[Opinion filed May 25, 1893.]

APPEAL from the Circuit Court of Peoria County; the Hon. T. M. SHAW, Judge, presiding.

Messrs. W. T. WHITING and JOHN W. CULBERTSON, for appellant.

Messrs. IRWIN & SLEMMONS, for appellee.

MR. JUSTICE LACEY. The appellee brought suit against the appellant in an action of case to recover damages for injuries to one of his feet, caused, as he alleged, in not keeping its streets in reasonable repair, by reason of which he was compelled to jump from his wagon, and by lighting with the hollow of his foot on a street car rail, injured it.

The cause was tried in the court below and there was recovery for $1,100 by verdict of a jury and judgment, and

appeal taken from that court to this and reversal asked on several grounds, the most important of which is that the verdict is manifestly against the weight of the evidence and the court gave improper instructions for appellee and refused proper ones offered by appellant.

Adams street, in the city of Peoria, on the 11th of May, 1891, the day of the accident, and at the place where it occurred, was situated as to location and surroundings as follows, viz : Adams street being one of the main streets in the city, runs from a northeasterly to a southwesterly direction, and above where it intersects Franklin street, is sixty feet and below that point is fifty feet wide; at a certain point Franklin and Harrison streets cross it at certain angles, the last named street running north and south—Harrison street being east of Franklin street and 300 feet from it. Adams street runs in the same general direction with the Illinois river from the northeast to the southwest; and it is called up and down according to the flow of the river. There was an electric street railway in operation on Adams street on the day of the accident, and had been so for some time. The street car company had the right of way on the street fourteen feet wide, and was operating a double track on the street extending past the intersections of Franklin and Harrison streets.

By permission of the city, the gas company some time prior to the accident had been laying its service pipe in Adams street along and past its intersections with Franklin and Harrison streets and was so engaged on the said 11th day of May, the work having been suspended since the 4th day of May in order to give the water company, which by similar permission was laying its water pipe across Adams street, coming down from Franklin street, opportunity to lower its pipe so that the gas pipe could cross it on a level. Before the morning of the 11th May the water company had lowered its pipe and filled up the ditch under the railway tracks and from the tracks across the lower or river side of the street so that teams and wagons passing up and down the street could pass on the entire width of

the street between the lower part of the electric railway track and the lower curbstone of the street, except at the point opposite the place of accident two to three feet was obstructed by brick and gas pipe at the lower curbstone. On the lower side of Adams street between the curb line and the lower rail of the street car track there was a space of twenty-two feet, less the two or three feet obstructed by the brick being against the lower curbstone, which the evidence showed gave ample room for public travel with wagons and teams, and for the passing of such moving in opposite directions.

On the morning of the 11th of May, the day of the accident, there was a large excavation at the intersection of Franklin and Adams streets, running from a point below the intersection of the streets along up and parallel with the north rail of the north track of the street car company to a point half way between Franklin and Harrison streets, about 155 feet. The depth of the ditch was from eighteen inches at the northeast end to three feet ten inches at the point where the accident occurred. The margin of this ditch was about eighteen inches to two feet distant from the upper rail of the street railway track, and the center of the ditch about four feet, and the ditch about four feet wide. This ditch was the gas company's ditch. At the point where the water company's ditch crossed the gas company's ditch at right angles, on account of the sandy nature of the soil and two excavations crossing each other, it made a hole of seven or eight feet wide. This excavation started close to the track but underneath it; the ditch had been filled up but had sunk a little, from six to ten inches, but it appears from the evidence to have been perfectly safe to cross, as teams had been crossing it on the electric railroad tracks for a day or two without difficulty. The crossing of the two ditches was just below or very nearly opposite where the accident occurred.

On the morning of the day of the accident, the appellee, who is a cooper, residing and doing business about ten blocks northeast of the place of the accident, and who was deliver-

ing barrels about the same distance southwest from such place of accident, and Adams street being the nearest traveled route between where the barrels were made and where they were to be delivered, undertook to deliver a load of barrels, and as the evidence shows, on the morning of the accident he started, with his team hitched to a wagon, with a barrel rack on loaded with eighty barrels, to deliver, and passed down Adams street, going toward the southwest; and came along down the street past the gas company's trench, and instead of taking the lower side of the street below the railway track, he got on the upper track, with his wagon wheels inside the flanges, and was proceeding down in that way in a fast trot as some of the witnesses say, or in a fast walk or trot as he says, in his testimony, and sitting up on his load, some eight feet high from the ground, and when he reached the point where the water company's ditch crossed the gas ditch (near the corner of Franklin and Adams streets) as he testifies, " there seemed to be a lowering in the track; it probably had been excavated and filled in and settled a little, and either that or the hole on the right hand side of the track scared the horses and they shied from it, and as they shied, I (appellee) straightened up the lines to keep them in the track and in some manner or form it threw the right hind wheel over the track. * * * When the wheel went over the track I thought the whole load, horses and all, were going to tip over there and I jumped to this side of the rack and jumped off and at the same time I pulled the horses around so as the other wheel was over, and the horses pulled it out. In jumping off I lit on the street car rail in the hollow of my foot." 

He called a physician and the injury was quite severe and laid him up for three months, and at the time of trial the wound still pained him.

Another witness, Frank Prince, who was at work on a building close by, and was entirely disinterested, tells a different story as to the manner of the accident. He says, the first that attracted his attention to the team, as it was coming down the street, " I saw Walker, whom I know by

sight; I heard him halloo whoa, and he was pulling on the lines and then he jumped; and when he jumped he fell back and pulled the lines pretty tight as he fell. The wagon slipped I should think six feet on the car track; it did not tip before Walker jumped but very little, because it would take a very little tip to throw off the barrels. He turned the horses to the left; they were not pulled to the right again; they were pulled right backwards. There was a street car coming on the other track at the time the horses were pulled back; at the time Walker struck the iron rail the car was probably ten or fifteen feet from them. When he first pulled the horses to the left the car was near the middle of the block from them, 100 to 150 feet. I noticed the horses scared at the cars; the black one (the black mare) saw the cars a good ways off. I know the black mare and know her disposition; she was very scared of street cars; I have driven the mare along Adams street along the car line. She was nervous and skittish, scared at most anything."

Robert Sarmis, also testified, that he was in the livery business; before that was bookkeeper for Griswald & Co., and appellee delivered barrels to the firm for several years, and was acquainted with the team. "The black mare was nervous and would shy at most any thing, etc. Walker tried to sell the mare to him in fall of 1891, and he objected to her on that account, 'too flighty and nervous for livery stable use.' Walker then claimed she was all right; but witness had noticed her when he was unloading barrels, 'and she would not stand well and was nervous and had to be watched.' Walker seemed to think she was not to be trusted.' Walker said at the time 'he didn't think there was any thing wrong, but it was best to watch her,' * * * that the mare was nervous."

Charles E. Anderson, who stood opposite where the accident happened, called by appellee, testified, that "Walker came down until he got close to the excavation and then for some reason he went to turn out; and as he went to turn out the left hind wheel caught on the lower side of the track on the upper flange and the right wheel on the upper rail

and the wheels slid for six or eight feet, and when the
wheels began to slide he got over on the left side of the
wagon and jumped." The witness testified in substance
that the right-hand front wheel went into the ditch, but he
jumped just before the wheel went over; and further says the
" appellee could have driven down in the track if the car had
not approached. There was nothing to prevent Walker
from driving on the lower side of the street between the
lower track and lower curb stone.    *    *    *    One of
the horses was frightened. I can't tell whether at the
depression in the street or street car.    *    *    *    The
horses were coming along, feeling good, full of life, a good
lively team."

It is true appellee testified his horses were not afraid of
the cars and one other of his witnesses corroborates him.

But we feel satisfied from an overwhelming weight of the
evidence that the black mare was nervous and easily fright-
ened, and that appellee well knew it and that she was not to
be trusted in a critical or dangerous place.

The evidence discloses that all suitable barriers and sig-
nals were kept in place by the gas company and water com-
pany to prevent accident during the night time, but as no
questions arise making the notice of such proof necessary,
and no injury was received during the night, we need not
notice or disclose them. The appellant relied on the fact
that the excavations and embankments of defendant were
in plain view, and that men were at work in the ditches and
on the ditching work, as a sufficient warning for all passers,
if in the exercise of ordinary care, of the presence of the
ditches and embankments complained of in the declaration.
And the appellee admits in his testimony that the first he
knew of the excavation he was probably 100 feet from it,
but was not a great ways from the hole when he noticed it
was so large. And it can not be denied that a man using
ordinary care, being elevated eight or ten feet from the
ground on a wagon, with nothing to obstruct the view,
could have easily seen the ditch dug by the gas company as
well as the one by the water company, while coming down

the street car track in the manner appellee did.   Then he should be held to all the notice a reasonable caution would have given him, but such notice would impose on appellee corresponding great care and caution in the presence of such dangerous situation to avoid accident; and it *should not* be required for a city to station policemen to watch passers by of a danger in plain view.

The appellants, it is not denied, had a right to have those pipes sunk in the streets, and to give the permission it did to the gas and water companies to sink them.   The excavations were, then, a lawful act and the city was only required to exercise ordinary care in notifying the public traveling on the street of the true condition of the streets, and if the public knew of the condition of the streets, or by the exercise of ordinary care could have known of it, then the city would be excused for any failure to give notice.   It seems to us that the gas and water companies, and the city, which was responsible for the manner in which the work was done, used all the care a reasonable prudence would require.   It sufficiently appears, all the evidence considered, that appellee was himself directly responsible on account of his own negligence for the accident.   As a citizen, he must have known that the street cars were passing at intervals at the time and that the ditch excavated by the gas company was to his right, for he could see it from his elevated position on the wagon, and that it was so close he could not turn to the right, and that if he went along that track he was liable to be hemmed in with his big wide load of barrels, drawn by a fractious team, between the ditch on the one side and the passing electric car on the other.   This, as a reasonably prudent man, he ought to have anticipated and guarded against.   And we are not surprised that when he saw the street car coming a half a block away on the lower track, he would try to escape to the lower side of the street. We are aware he denies seeing it, but we are quite well satisfied from the other evidence he did.   But whether he did or not it is immaterial; his horses became frightened at something, and this he might reasonably anticipate from the

position he placed himself in. He ought not to have placed himself in a position where, by the frightening of his horses, he would be in peril, and more especially where there was a safer way open.

The small depression in the street under the railroad track was not dangerous in itself and was not alleged as the cause of the accident, even if it frightened the horses, which we think the evidence fails to establish. The cause of action, as submitted to the jury in the appellant's instructions, was the excavation on the upper side of the railroad track, to escape the danger of falling into which appellee jumped from the wagon, and the failure to protect the same by barriers. A barrier, if strong enough, might be as dangerous to a team running away in the streets as the ditch without one. With proper care on the part of appellee under the circumstances we see no need of any barrier along the lower side of the ditch, and considering its close proximity to the car track, we do not see how one could be made without interfering with the passing cars.

It can not be denied that if ordinary prudence required it, the city would be bound to construct barriers against teams and wagons falling into the ditches being excavated, and that it is a matter of fact for a jury to determine whether ordinary care required it in the present case to guard against such accidents as happened to appellee. While this is the law, such finding by a jury is not final and is subject to review and correction, if erroneous, by this court, which is the final tribunal with power to pass upon such facts. When we find in any case a jury has found facts upon which their verdict must necessarily be based on insufficient evidence, and contrary to common reason and justice, it is our duty to interfere and set aside such verdict. We can not but feel that the jury in passing on the facts of the case has entirely misapprehended the force and weight of the testimony and has given a verdict contrary to its manifest weight.

The evidence in the case is not materially conflicting. In viewing the case from the standpoint of the appellant,

to allow the excavations in question to be made, the consideration would naturally arise whether barriers should be put up of sufficient strength to prevent teams passing down the streets in the day time from falling into the ditches.  The city authorities would not only think that such an extreme precaution would not be necessary; for the ditches were in plain sight and a reasonable prudence would require that teams should keep far enough away to prevent accident, more especially as there was plenty of such room for the passage of teams in perfect safety, and it could not be possible that a prudent man would undertake to drive in the upper street car track and subject himself to be hemmed in by a car passing in the opposite direction and a deep ditch; or to other dangers by frightening of his team otherwise of being thrown into the ditch.  And even in case of a barrier, unless it were a wonderfully strong structure, such an accident could not be avoided.  It appears to us that the appellant, and the gas and water companies did all in the way of preventing the kind of accident that happened in this case that it or they need have done.  If that be so, and there was not negligence on the part of the city or those for whose acts it was responsible, there can be no recovery.  And even if it could be cause of complaint that the excavations were allowed to remain too long, of which there is no sufficient evidence, the case would not be changed.

It is a well settled rule of law, as said by Lord Ellenborough, Butterfield v. Foster, 11 East, 60, that " a party is not to cast himself upon an obstruction which has been made by the default of another and avail himself of it, if he do not use common and ordinary caution, to be in the right."

On the other hand, the evidence, as it appears to us, clearly shows that the appellee was himself guilty of great negligence and want of due care in not taking the lower half of the street, which there is no question he could easily have done and prevented accident.  Instead, he came down the street on a trot, with the ditch on his right in plain view and the street cars running on the left track, liable to be caught at any moment between the car and the ditch, or by

the scare of a skittish and fractious team, be thrown into the ditch. If the appellee had made out as good a case of negligence against the appellant as the evidence shows against him we would not hesistate a moment to affirm the judgment. We see no sufficient reason for holding the city responsible for this accident. If any one was to blame it was appellee himself, much more so than the appellant. We feel entirely unwilling to sustain a verdict on such insufficient evidence. It would be natural that the appellee would desire to go on the car track with his load as it was hard and smooth and much easier to draw a load on; but this could be no excuse for taking unnecessary risks, as was done.

The appellant objects to the second, fifth, sixth and eighth of appellee's instructions. As we must reverse the judgment on the facts, it is not absolutely necessary that we notice the instructions, but we will do so to some extent, as the questions raised are important.

We see no particular objection to the fifth instruction given for appellee. It appears to anounce the law correctly. The sixth also seems to be in due form; also the eighth appears to be correct. The second instruction given for appellee is as follows, viz:

" 2. The court instructs the jury, that while a person is bound to use reasonable care to avoid injury, he is not held to the highest degree of care and prudence of which the human mind is capable; and to authorize a recovery for an injury, he need not be wholly free from negligence, provided his negligence is but slight and consistent with such slight acts of negligence as an ordinary prudent and cautious man would be guilty of under the same circumstances."

This instruction, we think, was not needed in the case, and while to an educated mind, one that can comprehend the effect and meaning of all the decisions made by our Supreme Court on the doctrine of comparative negligence, it may not appear illogical and unreasonable, yet, to a jury it would probably be incomprehensible and tend greatly to puzzle rather than enlighten it. Why set a jury to settle the greatly mooted question of what slight negligence con-

sists, or what the proper definition of the term is, when courts of high authority have labored for years to define it and the question is still unsettled?

The court, in the instruction, says it is such slight acts of negligence as an "ordinary prudent and cautious man would be guilty of, under the same circumstances." If that be the proper definition there would be no negligence whatever in a legal sense of the term, if the appellee were in the exercise of ordinary care, which, by the instruction he must be, to entitle him to recover. The instruction then that to entitle the appellee to recover, he must have been in the exercise of ordinary care, such as an ordinary prudent person would have exercised under the circumstances, was all that was needed and that without that, he could not recover, unless the injury was wilfully inflicted. Then with those given instructions it were futile to set the jury to speculating on the problem of slight negligence. Then again the Supreme Court has often held it to be error to submit the question of comparative negligence to the jury in any other form than that the plaintiff's negligence shall be slight in comparison to the negligence of the defendant which must be gross. C. B. & Q. R. R. Co. v. Harwood, 90 Ills. 425; Ill. C. R. R. Co. v. Hammer, 72 Ill. 347, and many earlier and later cases might be cited.

But great difficulty has arisen on account of subsequent decisions of the Supreme Court in finding a case where the doctrine of comparative negligence can be applied, and in fact it would seem impossible to find such an one in view of the conclusive determination in the cases of the C. B. & Q. Ry. Co. v. Johnson, 103 Ill. 512; and Calumet Iron & Steel Co. v. Martin, 115 Ill 358; the opinion in both cases being written by Judge Scholfield. In the former case the following proviso was added to four different instructions primarily basing the right of Johnson to recover on the exercise of care on his part and the want of it on the defendant's part, to wit: "But if from all the evidence it shall appear that Johnson was not exercising ordinary care, yet the plaintiff may recover if Johnson's negligence was slight

and that of defendant was gross in comparison with each other, and the verdict must be for the plaintiff." The court below gave the instructions with the proviso to the jury.

The court reversed the judgment of the Appellate and Circuit Courts on account of the giving of those instructions with the above qualification added, and most emphatically held that in such case, where there was want of ordinary care on the plaintiff's part, it conclusively implied more than slight negligence on his part; it was "ordinary negligence."

The court refers then to legal definitions of slight negligence and ordinary negligence or want of ordinary care and says "it must of course be understood the terms 'slight negligence,' and 'gross negligence' are used in their legal sense as defined by common law writers.' * * * And Story says "he who is only less diligent than very careful men can not be said to be more than slightly inattentive." He who omits ordinary care is a little more negligent than men ordinarily are, and he who omits even slight diligence fails in the lowest degree of prudence and is grossly negligent. The court then follows with this language: "It can not then legally be true that where the plaintiff fails to exercise ordinary care, and the defendent is guilty of negligence only, the plaintiff's negligence is slight and that of the defendant gross in comparison with each other;" meaning where the defendant did not commit the injury wilfully. In other words, it was held that the conditions of the portion of the instructions referred to were a contradiction in terms, and the conditions could not exist together, one being guilty of the want of ordinary care and at the same time only guilty of slight negligence.

Of course, then, logically there could be no application of the doctrine of comparative negligence where the plaintiff was not in the exercise of ordinary care. And we understand the Supreme Court in a late decision has held this language. Pullman Palace Car Co. v. Laac, 32 N. E. Rep. 289. It was said in the Johnson case above, and more care-

City of Peoria v. Walker.

fully and explicitly affirmed in Calumet Iron and Steel Co. v. Martin, *supra*, that in order to entitle a plaintiff to recover in such cases he must show that he was in the exercise of ordinary care, and that no exception existed to this rule. It was a *sine qua non*, unless perhaps the injury is committed wilfully. If then a plaintiff may recover when he is, and must be, in the exercise of ordinary care, and the defendant is not in such exercise, he apparently has no need whatever to invoke the doctrine of comparative negligence, and take upon himself the burden of showing that his negligence was slight and that defendant's was gross in comparison with it, which is held in the Johnson case to be a greater degree of negligence than the want of ordinary care, and if the failure to exercise ordinary care is gross negligence, such an instruction would have no meaning whatever ; for in that event the measure of the defendant's negligence must be the same, whether the plaintiff is guilty of slight negligences or is in the exercise of ordinary care ; and a further absurdity, the plaintiff would be excused from the exercise of ordinary care.

It is still more grievous if such an instruction be given for the defendant ; that is, in case plaintiff is guilty of slight negligence, which he may be, and at the same time be in the exercise of ordinary care, as we have above seen ; he should then be compelled to show that defendant was guilty of gross negligence (a supposed higher degree than want of ordinary care, in comparison), when in fact, according to another rule of law, if he is in the exercise of due care, he only has to show that the defendant was not in its exercise. An instruction that can not be given on either side would seem to be vicious, yet in Calumet Iron & Steel Co. v. Martin, *supra*, the court seems to sanction the giving such an instruction by either party and says "such an instruction might, without impropriety, have been given." It was not "indispensable."

In establishing the doctrine originally of comparative negligence the idea seemed to prevail that where as a rule the plaintiff could not recover on account of a slight want

of ordinary care on his part he might be excused by show-
ing that in comparison with his slight want of due care
(slight negligence it was termed) the defendant was grossly
negligent; thus giving him a right to recover. If we inter-
pret this term, slight negligence, to mean a slight want of
care greater than an ordinary prudent person would be
guilty of under the circumstances, then the doctrine would
have practicable application and would be of great benefit
to a party situate as above supposed. Of course, as it stated
in the Calumet Iron & Steel Co. v. Martin, above, with a
long list of Supreme Court decisions cited in support, it had
often been decided, that as a condition of recovery the plaint-
iff must show that he was in the exercise of ordinary care.
But as the court always adhered to the doctrine of com-
parative negligence, would it not be reasonable to suppose
that it regarded the latter as an exception? The law, how-
ever, seems latterly to be finally established against any ex-
ception to the rule prohibiting a recovery without the due
exercise of ordinary care, and we regard it as a great im-
provement, as being the more plain and simple.

The comparison of the plaintiff's slight negligence under
any meaning of the term with the gross negligence of the
defendant opened a wide field for speculation and conjecture,
and gave the jury almost unlimited power to give the plaint-
iff a verdict in any kind of a case. And juries in a large class
of cases were found to take ready advantage of the rule.
But now without any comparative negligence doctrine the
law is plain and simple. With the rule that the plaintiff
must be in the exercise of that care that an ordinary pru-
dent person would use, and the defendant the same, it would
seem that the doctrine could have no intelligent application,
and that it would be mischievous and erroneous to base an
instruction upon it.

As long as such practice is followed, juries will give in-
structions a practicable application, which according to the
law, as now held, would be detrimental to one or the other
of the parties.

We do not wish to hold, in the absence of a decision of

the Supreme Court, that the giving of an instruction on the doctrine of comparative negligence in the prescribed form would be error, but we would condemn, as the Supreme Court has done, one not in accordance with the law in that respect.

*The judgment is reversed and the cause remanded.*